

# In the
# Missouri Court of Appeals
# Western District

**STATE OF MISSOURI,**
            **Respondent,**

                                        **WD85186**
                                        **OPINION FILED:**
                                        **June 27, 2023**

**v.**

**ROCKY L. COYLE,**
            **Appellant.**

### Appeal from the Circuit Court of Linn County, Missouri
The Honorable Terry Alan Tschannen, Judge

Before Division Three:  Janet Sutton, Presiding Judge, Cynthia L. Martin, Judge, and
Edward R. Ardini, Jr., Judge

Rocky L. Coyle ("Coyle") appeals from a judgment convicting him of two counts

of child molestation in the second degree and one count of sexual abuse in the first

degree.  Coyle argues on appeal that the trial court committed plain error in submitting

verdict directors that failed to sufficiently specify a particular instance of sexual contact,

thereby depriving Coyle of his constitutional right to a unanimous verdict.  Coyle also

challenges the trial court's admission of propensity evidence, arguing that its prejudicial

impact substantially outweighed its probative value.  Finding no error, we affirm.

## Factual and Procedural Background

The State charged Coyle with two counts of second-degree child molestation in violation of section 566.068[1] ("Count I" and "Count II") and one count of first-degree sexual abuse in violation of section 566.100[2] ("Count III"). Viewed in the light most favorable to the jury's verdicts,[3] the evidence at trial established the following:

T.C. ("Victim"), a female, was born in 2001. While she was growing up, Victim lived with Coyle, who is her biological father, and her brother in Brookfield, Missouri.[4] At some point, another man, Kenneth Jenkins ("Jenkins"), lived in the home as well and resided in Victim's room. When Jenkins was residing in her room, Victim slept in the living room on a recliner or couch. Victim would also fall asleep in the living room after watching a show.

On April 20, 2018, Victim went to her aunt's home in Columbia, Missouri. Victim's aunt asked "if anything was going on in the Brookfield house." Victim initially denied that anything was happening out of fear. Eventually, though, Victim began crying and told her aunt that Coyle had been touching her in a sexual manner without offering

---

[1]All statutory references are to RSMo 2016 as amended through January 1, 2017, the earliest date first-degree child molestation was alleged to have been committed by Coyle, unless otherwise indicated.

[2]The charge of first-degree sexual abuse was alleged to have been committed by Coyle between July 13, 2015, and December 31, 2016. All statutory references to section 566.100 are to RSMo 2000 as amended through July 13, 2015, unless otherwise indicated.

[3]"We view the evidence in the light most favorable to the jury's verdicts, disregarding all contrary evidence and inferences." *State v. Jackson*, 636 S.W.3d 908, 913 n.1 (Mo. App. W.D. 2021).

[4]Victim testified at trial that her biological mother was "not in the picture."

2

additional details. After disclosing the sexual abuse, Victim moved to Columbia and only returned to the Brookfield home to collect her belongings.

Victim's testimony at trial detailed the abuse she suffered from Coyle while living in the Brookfield home. During the two months immediately preceding her disclosure of sexual abuse to her aunt, Victim had a difficult time sleeping at night because, when she slept in the living room, she would "oftentimes wake up with [Coyle's] hand touching [her] breasts" underneath her shirt, claiming that he was looking for her glasses. Victim said incidents like this happened at least once a month. Victim described an incident where Coyle asked her, "What would you do if you woke up and I was raping you?", and another incident where Coyle remarked that Victim's vagina "was so tight," suggesting he had touched Victim while she slept. Victim testified that she would occasionally sleep in her brother's room because Coyle would not enter the room with her brother present.

Victim testified about Coyle's behavior during the seventeen months immediately preceding her disclosure of sexual abuse to her aunt. Victim testified that Coyle would help Victim dye her hair once or twice a year during this time frame, by assisting with applying the color and rinsing it out in the kitchen sink. When Victim hung her head in the kitchen sink so that it could be rinsed, "[Coyle] would position himself directly behind [Victim] and rub his genitals onto [her] body." Victim testified that Coyle did this more than once while assisting Victim dye her hair, but that she did not remember if she ever confronted Coyle about his behavior.

Victim described a time that Coyle was tickling her "in [a] playful manner." While running away from Coyle, Victim tripped and fell face-down onto her bed. Coyle

3

then pinned down Victim's hands, laid on top of her, and began rubbing his genitals against Victim's body. Victim told him to "just stop," but Coyle refused. Coyle eventually got off of Victim, and angrily said he was just playing around. Victim did not explain when this incident occurred, but testified it happened "one time."

Victim testified about two other circumstances without explaining when they occurred. Victim testified that there were times that Coyle would ask her to come to his bedroom to talk. Coyle would tell Victim to lie on the bed with him and that she would be grounded if she refused. Victim would lie on the bed and Coyle would talk to her for a while before beginning to rub his genitals against her bottom while making sexual comments to her. Victim also testified about a time where she needed a new bra and asked Coyle if she could get one. To "measure" Victim's bra size, Coyle reached into Victim's bra and cupped her breasts.

Prior to trial, the State filed notice of its intent to present propensity evidence pursuant to article I, section 18(c) of the Missouri Constitution. The notice disclosed the State's intent to present evidence that Coyle committed sexual crimes against two minors in or about December 2005. The described evidence included: (1) statements made by the minors on March 14, 2006, during a forensic interview at the Children's Advocacy Center, and (2) testimony from the minors--now adults--that Coyle sexually abused them in or about December 2005.

The trial court held a hearing regarding the intent to present propensity evidence, and heard testimony from D.P. and E.G., the minors who claimed they had been sexually abused by Coyle in or about December 2005. Following the hearing, the trial court

4

ordered that the State could elicit testimony from D.P. and E.G. about the alleged abuse, but could not offer into evidence statements made by the minors at the Children's Advocacy Center.

At trial, the trial court told Coyle's counsel prior to voir dire that, if he wished to have a continuing objection to the admission of D.P. and E.G.'s testimony, the trial court would grant one. Coyle's counsel indicated that he would accept the trial court's offer, but might also elect to object when the propensity evidence was offered "just to make sure it gets on the record." However, Coyle's counsel did not later lodge an objection to D.P.'s or E.G.'s testimony when it was offered.

D.P. testified that in December 2005 when she was around fourteen years old, she spent Christmas break with E.G. at the home of E.G.'s grandmother near Trenton, Missouri. D.P. testified that she met Coyle, who is E.G.'s uncle, during this time. D.P. testified that Coyle made remarks that made her feel uncomfortable, such as telling her that she had a "cute butt." D.P. described two incidents involving Coyle. D.P. testified about a time that Coyle "pin[ned] [her] down" and rubbed his genitals against her body. And she testified about a night when Coyle attempted to convince D.P. and E.G. to drink alcohol and made remarks about having a date rape drug before suggesting that the three of them play a game that involved writing on the body of the person who fell asleep first. D.P. testified that she and E.G. agreed to pretend to fall asleep first. As D.P. pretended to sleep, Coyle reached up D.P.'s shirt to massage her breasts and then placed his hands down her pants to massage her genitals. Because she was scared, D.P. pretended she was asleep and kicked E.G. to alert her to what was happening. E.G. told Coyle that D.P. was

5

awake. Coyle laughed. D.P. then fell asleep and, when she woke up, she was lying next to a blow-up sex doll. There was also writing on D.P.'s stomach, particularly an arrow pointing toward her face near the words "the hills," and an arrow pointing toward her feet near the words "the valley." D.P. told her mother about Coyle's conduct. D.P. was interviewed at the Children's Advocacy Center in Trenton, but no charges were ever filed against Coyle.

E.G. testified that she was also around fourteen years old in December 2005 when D.P. stayed at her grandmother's home. E.G. testified that Coyle drew arrows and wrote "the hills" and "the valley" on D.P.'s stomach. E.G. also described instances where Coyle would be "very handsy" by grabbing her bottom and breasts. In addition, E.G. testified about an incident at her aunt's home. E.G. was using the computer after everyone else had gone to bed when Coyle walked into the room. Coyle knelt next to the computer desk, told E.G. that he had exposed his penis, and asked E.G. to look at his penis. E.G. refused to look at Coyle's penis and ignored him until he walked out of the room. E.G. was also interviewed at the Children's Advocacy Center in Trenton, but no charges were ever filed against Coyle.

Coyle testified and denied having any sexual contact with Victim. His strategy at trial was to challenge the credibility of Victim's testimony in nearly every detail.

During a brief jury instruction conference on the record, the State indicated that it had no objections to the proposed jury instructions. Coyle's counsel indicated that he had reviewed and had no objections to the proposed instructions.

6

Instruction No. 5 concerned the first count of second-degree child molestation and provided:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about between March 1, 2018 and April 20, 2018, in the State of Missouri, the defendant touched the breasts of [Victim], and

Second, that the defendant did so for the purpose of gratifying the defendant's sexual desire, and

Third, that [Victim] was a child less than seventeen years of age, and

Fourth, that the defendant was more than four years older than [Victim], and

Fifth, that in the course of this conduct, the defendant knew that [Victim] was defendant's descendent by blood,

then you will find the defendant guilty under Count I of child molestation in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Instruction No. 6 concerned the second count of second-degree child molestation and provided:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about between January 1, 2017 and April 20, 2018, in the State of Missouri, the defendant touched [Victim's] bottom with defendant's genitals, and

Second, that the defendant did so for the purpose of gratifying the defendant's sexual desire, and

Third, that [Victim] was a child less than seventeen years of age, and

7

Fourth, that the defendant was more than four years older than [Victim], and

Fifth, that in the course of this conduct, the defendant knew that [Victim] was defendant's descendent by blood,

then you will find the defendant guilty under Count II of child molestation in the second degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Instruction No. 7 concerned first-degree sexual abuse and provided:

As to Count III, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about between July 13, 2015 and December 31, 2016, in the State of Missouri, the defendant touched [Victim] with defendant's genitals, and

Second, that the defendant did so for the purpose of gratifying the defendant's sexual desire, and

Third, that defendant did so by the use of forcible compulsion,[5]

then you will find the defendant guilty under Count III of sexual abuse in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

After the trial court read the instructions to the jury, the State and Coyle's counsel presented their closing arguments.

---

[5]Instruction No. 8 instructed the jury that the term "forcible compulsion" means "either physical force that overcomes reasonable resistance or a threat, express or implied, that places a person in reasonable fear of death, serious physical injury, or kidnapping of such person or other person."

The State's argument began by focusing on Victim's testimony related to the three charges. The State argued:

> What did you hear today? Specifically, when [Victim] was testifying--we'll speak to Count I--that about a month and a half prior to her going to [her aunt's] house, that her father touched her breasts. She testified that this happened more than once. She testified that she would wake up and he would be in her room looking for her glasses, but his hands would be on her breasts. She testified that she had trouble sleeping, that she didn't want to go to sleep, or that she would go and sleep in her brother's room. She would sometimes fall asleep at school. She'd have a hard time. . . . She was living in a home with a person who would do this to her in the middle of the night while [she was] sleeping. That's scary. And that's [her] dad. At the time this occurred--as you heard her birthday was in . . . 2001--she was under 17 at the time. Brookfield in Linn County, Missouri.
>
> Going to Count II, we talked about between January of 2017 and right before she went to [her aunt's home], that he would rub against her with his genitals. You heard her testify the different ways he would do that would be when he was washing her hair and helping her with the hair dye, or when they were playing around and when he was tickling her and he'd pin her down on the bed and rub himself against her. You heard that these things would start up in an innocent way and then it would get worse, and then it would turn into something sexual. You heard her testify, as to Count III, when he pinned her down on the bed and she couldn't move her arms and he was rubbing against her.

The State devoted the remainder of its closing argument to explaining Victim's reluctance to disclose her father's abuse, reminding the jury that D.P. and E.G. testified to experiencing similar abuse from Coyle, and discrediting Coyle's testimony.

Coyle's closing argument primarily attacked Victim's credibility by focusing on her inability to remember details.

The jury found Coyle guilty on all three counts. Coyle's motion for new trial asserted, *inter alia*, that the trial court committed error in admitting the testimony of D.P. and E.G. as propensity evidence because the prejudicial effect of the testimony

9

outweighed its probative value. The motion for new trial did not allege instructional error on any basis.

The trial court denied Coyle's motion for new trial and sentenced Coyle to ten years' incarceration for each count of second-degree child molestation and ordered those sentences to run concurrently, and to four years' incarceration for first-degree sexual abuse and ordered that sentence to run consecutively to the other sentences ("Judgment").

Coyle appeals.

## Standard of Review

### *Points One, Two and Three*

Coyle challenges the verdict directors, Instructions No. 5, No. 6, and No. 7, in three of his five points on appeal, and claims they were not sufficiently specific to ensure his constitutional right to a unanimous jury verdict. Coyle acknowledges that he did not preserve these challenges for appellate review because he did not object to the verdict directors during the instruction conference, or challenge the verdict directors in his motion for new trial. *See* Rule 28.03[6] ("Counsel shall make specific objections to instructions or verdict forms considered erroneous. . . . The objections must also be raised in the motion for new trial in accordance with Rule 29.11."). Coyle nonetheless asks this court to exercise its discretion to review the verdict directors for plain error pursuant to Rule 30.20.

---

[6]All rule references are to Missouri Supreme Court Rules (2021), unless otherwise indicated.

10

The State urges us to deny Coyle's invitation to afford plain error review. The State argues that counsel's affirmative expression that he had "no objection" to the verdict directors constitutes invited error that waives plain error review. We rejected a similar argument in *State v. Gannan*, 658 S.W.3d 103 (Mo. App. W.D. 2022), because we were compelled to do so by binding Supreme Court precedent.

In *Gannan*, the defendant's attorney affirmatively stated that he had no objection to proposed verdict directors, but sought plain error review of the verdict directors on appeal because they were not sufficiently specific to ensure that the jury's verdicts were unanimous. *Id.* at 108, 112. We afforded the verdict directors plain error review because our Supreme Court has held that a defendant does not waive plain error review by failing to object to a faulty jury instruction, by failing to correct a faulty jury instruction, or by affirmatively telling the trial court that the defendant has no objection to a faulty jury instruction. *Id.* at 110-11 (citing *State v. Clay*, 533 S.W.3d 710, 715 (Mo. banc 2017); *State v. Wurtzberger*, 40 S.W.3d 893, 897-98 (Mo. banc 2001)). In fact, in *State v. Celis-Garcia*, 344 S.W.3d 150, 154 n.3 (Mo. banc 2011), our Supreme Court afforded plain error review of verdict directors alleged to have violated the right to a unanimous jury verdict even though the defendant herself tendered refused verdict directors suffering the same defect. Unless and until the Supreme Court re-evaluates the availability of plain error review of jury instructions in a criminal case, particularly where the defendant has affirmatively expressed no objection to the instructions at trial or has tendered a similarly defective instruction, we are without authority to conclude that plain error review has

11

been waived.[7]  We therefore afford Coyle's unpreserved claims of instructional error

plain error review.  *See* Rule 30.20 ("Whether briefed or not, plain errors affecting

---

[7]Despite the constitutional significance of the right to a unanimous verdict, it may be time to re-evaluate whether a defendant in a multiple acts sexual offense case can retain the right to plain error review of purportedly faulty verdict directors after affirmatively assuring the trial court that the defendant has no objection to the instructions.  In *State v. Celis-Garcia*, 344 S.W.3d 150 (Mo. banc 2011), our Supreme Court explained that verdict directors in sexual offense cases involving evidence of multiple, distinct acts must be sufficiently specific to ensure unanimity about the defendant's act that serves as the basis for a conviction.  But, despite the guidance in *Celis-Garcia*, and the passage of well over a decade, the volume of cases raising similar unanimity issues in sexual offense cases suggests that little effort is being made to draft verdict directors that are as specific as the evidence would permit in order to fairly differentiate between multiple, distinct acts.  *See State v. Adams*, 571 S.W.3d 140, 144 n.3 (Mo. App. W.D. 2018) (holding that even though plain error review was afforded in *Celis-Garcia*, "there is virtually no excuse for the state or trial courts to continue to perpetuate instructional error (plain or otherwise) in multiple acts cases, when the roadmap for remediating instructional error was laid out in *Celis-Garcia*, and has been further developed in subsequent cases").

In *State v. Hamby*, No. SC99554, 2023 WL 3976252, at *9 (Mo. banc June 13, 2023), our Supreme Court recently acknowledged that "the numerous court of appeals cases grappling with jury unanimity issues in child sexual abuse cases demonstrate, multiple acts cases have continued to confound our court system since . . . *Celis-Garcia*." In an effort to address the problem, the Supreme Court authorized, as an alternative to identifying a specific, distinct act in a verdict director, the use of a special unanimity instruction in all cases where there is evidence of multiple acts of sexual abuse, even if not sufficiently distinct to constitute multiple, distinct acts.  *Id.* at **9-10 (*See infra* footnote 10).  This is certainly a significant step in the right direction,  However, the availability of a special unanimity instruction does not ensure that  the State will cease the practice of  instead tendering verdict directors that purport to differentiate between multiple, distinct acts with a bare temporal reference that may only have been briefly mentioned in the evidence, even though other and more memorable evidentiary details could easily be incorporated in the verdict director to assure the juror unanimity.  And it does not ensure that defendants will cease the practice of misleading the trial court by stating "no objection" in response to tendered verdict directors, only to later complain about the instructions on appeal, aware that current jurisprudence ensures that plain error review will not be deemed to have been waived.

Multiple acts cases require appellate courts to digest the entire trial transcript to determine whether the case involves multiple acts; whether multiple acts are generic and indistinguishable from one another such that submission of the "act" without greater

substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom.").

"Plain error review is discretionary and requires a showing of evident, obvious, and clear error resulting in a miscarriage of justice." *State v. Hamby*, No. SC99554, 2023 WL 3976252, at *4 n.4 (Mo. banc June 13, 2023) (citing *State v. Brandolese*, 601 S.W.3d 531 (Mo. banc 2020)). If we conclude that the trial court committed evident, obvious, and clear error, we proceed to determining "whether the error actually resulted in manifest injustice or a miscarriage of justice." *Gannan*, 658 S.W.3d at 111 (quoting *State v. Hendricks*, 619 S.W.3d 171, 179 (Mo. App. W.D. 2021)). Manifest injustice or a miscarriage of justice occurs if "there is a reasonable probability that the jury's verdict would have been different, had the error not taken place." *State v. Shade*, 657 S.W.3d 282, 292 (Mo. App. W.D. 2022) (quoting *State v. Roper*, 136 S.W.3d 891, 903 (Mo. App. W.D. 2004)). The appellant bears the burden to establish both that plain error occurred and that such error resulted in manifest injustice or a miscarriage of justice. *Id.*

Instructional error rarely constitutes plain error. *Gannan*, 658 S.W.3d at 111. To demonstrate that the trial court's decision to give a particular instruction constitutes plain

---

specificity in the verdict director is sufficient to protect the right to a unanimous verdict; or whether, where multiple acts are distinct enough to require differentiation, the basis for differentiation included in the verdict director sufficiently narrows the submitted act to one. Reigning in plain error review to disincentivize sand-bagging concerns about verdict directors in multiple acts cases could have the corollary effect of encouraging the State to better describe evidentiary distinctions between multiple acts in the interests of fundamental fairness. The goal, of course, is to protect the constitutional right of a defendant to a unanimous verdict, while "avoiding instructional error in multiple acts cases given that the failure to do so imposes a tremendous emotional burden on young victims who may be required to testify a second time." *Adams*, 571 S.W.3d at 144 n.3.

13

error, the appellant must establish "more than mere prejudice and must show that the [trial] court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error affected the jury's verdict, and caused manifest injustice or miscarriage of justice." *Id.* (quoting *State v. Alvarez*, 628 S.W.3d 400, 406 (Mo. App. W.D. 2021)).

### Points Four and Five

Coyle's remaining two points on appeal challenge the trial court's decision to allow D.P. and E.G. to testify about sexual contact that Coyle had with each of them when they were approximately fourteen years old. The trial court admitted this evidence over Coyle's continuing objection[8] pursuant to article I, section 18(c) of the Missouri Constitution, which allows the admission of propensity evidence in prosecutions of sexual crimes involving a victim under the age of eighteen years. Our review of the trial court's decision to admit propensity evidence pursuant to article I, section 18(c) is the same as our review of all evidentiary rulings. *State v. Williams*, 548 S.W.3d 275, 287 (Mo. banc 2018). We will not disturb the trial court's decision absent an abuse of discretion. *Id.* A trial court abuses its discretion when its decision to admit or exclude evidence "is clearly against the logic of the circumstances then before the court and is so

---

[8]The State does not challenge that the continuing objection preserved Coyle's claim of error for appellate review. However, parties are cautioned that continuing objections, even where based on pretrial hearings, "may not fully convey a party's exact concerns at the time testimony is offered." *State v. Minor*, 648 S.W.3d 721, 735 (Mo. banc 2022). Here, because Coyle's objection was to the testimony of D.P. and E.G. in its entirety, we are not concerned that the continuing objection was sufficient to preserve the claim of error raised on appeal.

14

unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Shade*, 657 S.W.3d at 292 (quoting *State v. Loper*, 609 S.W.3d 725, 731 (Mo. banc 2020)). If reasonable persons could disagree about the propriety of the ruling, an abuse of discretion has not occurred. *Williams*, 548 S.W.3d at 287. Even if we conclude that the trial court's evidentiary ruling constitutes an abuse of discretion, reversal is appropriate only if the appellant suffered prejudice. *Shade*, 657 S.W.3d at 292. "Trial court error in the admission of evidence is prejudicial if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (quoting *State v. Ellis*, 512 S.W.3d 816, 825 (Mo. App. W.D. 2016)).

**Analysis**

***The Verdict Directors Did Not Violate Coyle's Constitutional Right to a Unanimous Jury Verdict (Points One, Two, and Three)***

In his first three points relied on, Coyle argues that the verdict directors were insufficiently specific to protect Coyle's right to a unanimous jury verdict. Point One addresses Instruction No. 5, which instructed the jury about child molestation between March 1, 2018, and April 20, 2018. Point Two addresses Instruction No. 6, which instructed the jury about child molestation between January 1, 2017, and April 20, 2018. Point Three addresses Instruction No. 7, which instructed the jury about sexual abuse by forcible compulsion between July 13, 2015, and December 31, 2016. Coyle argues that the evidence at trial established multiple, similar acts of child molestation and sexual

15

abuse, and that the verdict directors failed to either specify a particular incident or instruct the jurors that they must unanimously agree on the same incident in contravention of *Celis-Garcia*. Accordingly, Coyle argues that the verdict directors resulted in manifest injustice because it is possible that he was convicted of child molestation and sexual abuse without a unanimous jury finding about the incident supporting each of his convictions, particularly as his defense strategy was to attack Victim's credibility.

Both the United States and Missouri Constitutions guarantee the right to unanimous jury verdicts in a criminal prosecution. In *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020), the Supreme Court of the United States held that "[t]here can be no question . . . that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."[9] Article I, section 22(a) of the Missouri Constitution provides, in relevant part, that "the right of trial by jury as heretofore enjoyed shall remain inviolate." Our Supreme Court has interpreted this provision "as protecting 'all the substantial incidents and consequences that pertain to the right to jury trial at common law.'" *Celis-Garcia*, 344 S.W.3d at 155 (quoting *State v. Hadley*, 815 S.W.2d 422, 425 (Mo. banc 1991)). For more than a century, our Supreme Court has held that one of the "substantial incidents" protected by article I, section 22(a) is the right to a unanimous jury verdict in a criminal prosecution. *See State v. Hamey*, 67 S.W. 620, 627 (Mo. banc 1902)

---

[9]In so holding, the *Ramos* decision abrogated companion cases decided by the Court in 1972, *Apodaca v. Oregon*, 406 U.S. 404 (1972), and *Johnson v. Louisiana*, 406 U.S. 356 (1972).

("When, therefore, the text writers and courts speak of the beneficial incidents of jury trial, they must be understood as referring to . . . 12 impartial jurors, indifferent between the state and the prisoner [who] must be summoned from the vicinage or county in which the crime is charged to have been committed.  They must unanimously agree on their verdict, and must be left free to act in accordance with their oaths and judgment."); *see also State v. Hadley*, 815 S.W.2d 422, 425 (Mo. banc 1991) (setting forth the same "substantial incidents and consequences" as "remain[ing] inviolate").  "For a jury verdict to be unanimous, 'the jurors [must] be in substantial agreement as to the defendant's acts, as a preliminary step to determining guilt.'" *Celis-Garcia*, 344 S.W.3d at 155 (quoting 23A C.J.S. *Criminal Law* section 1881 (2006), and citing *State v. Jackson*, 146 S.W. 1166, 1169 (Mo. 1912)).

Celis-Garcia considered how the constitutional right to a unanimous jury verdict is protected in a multiple acts case. *Id.*  A multiple acts case arises when "there is evidence of multiple, distinct criminal acts, each of which could serve as the basis for a criminal charge, but the defendant is charged with those acts in a single count." *Id.* at 155-56.  When determining whether a criminal prosecution is a multiple acts case, we consider the following factors: "(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct." *Id.* at 156 (quoting 75B AM. JUR. 2D *Trial* section 1511 (2007)).  In a multiple acts case, the defendant's right to a unanimous jury verdict is protected if: (1) the state "elect[s] the particular criminal act on

17

which it will rely to support the charge," or (2) "the verdict director specifically describ[es] the separate criminal acts presented to the jury and the jury [is] instructed that it must agree unanimously that at least one of those acts occurred." *Id.* at 157.[10]

*Celis-Garcia* applied these standards to conclude that the trial court committed plain error because the verdict directors violated the state constitutional right to a unanimous jury verdict by generally instructing the jury to find the defendant guilty if they believed she committed sodomy by hand-to-genital contact, despite evidence of multiple, separate instances of hand-to-genital contact, any of which would have supported a conviction. *Id.* at 158. The Supreme Court found that the plain error resulted in manifest injustice because the defense relied on exploiting factual inconsistencies in, and the implausibility of, the victims' testimony, creating a greater likelihood that individual jurors found the defendant guilty on the basis of different acts.

---

[10]The Supreme Court recently observed in *Hamby* that "these two solutions do not account for cases in which the evidence provides for repeated, indistinguishable acts . . . that cannot be sufficiently distinguished," warranting the articulation of a "separate solution to address multiple act cases." No. SC99554, 2023 WL 3976252, at *9 (Mo. banc June 13, 2023). In *Hamby*, the Court endorsed the use of a special unanimity instruction as "a preferable solution to address jury unanimity concerns--especially in multiple act cases . . . when the repeated acts of abuse are indistinguishable." *Id.* at *10. "A special unanimity instruction protects the constitutional right to a unanimous verdict without requiring the court to comb through the often vague and general descriptions of child sexual abuse to identify evidence that may sufficiently distinguish one act from another requiring specificity in the verdict directors." *Id.* Thus, going forward, in all cases where multiple acts of sexual abuse are in evidence, whether or not they are sufficiently distinct to render the case a multiple, distinct acts case, a trial court "will protect a defendant's right to a unanimous verdict so long as the jury instructions either identify a specific distinct act **or** include the special unanimity instruction." *Id.* (emphasis in orginal.)

*Id.* at 158-59.  Reversal of the convictions and remand for a new trial was thus ordered. *Id.* at 159.

Coyle claims that Instructions No. 5, No. 6, and No. 7 suffer from the same defect as the verdict directors in *Celis-Garcia*, and that he suffered manifest injustice as a result. We examine the verdict directors separately.

**Point One: Instruction No. 5**

Coyle's first point on appeal ("Point One") challenges Instruction No. 5, which directed the jury to find Coyle guilty of Count I if it found beyond a reasonable doubt that, between approximately March 1, 2018, and April 20, 2018, Coyle touched Victim's breasts "for the purpose of gratifying [Coyle's] sexual desire."  Coyle alleges that the evidence established two separate, distinct circumstances where Coyle touched Victim's breasts, specifically: (1) Victim's testimony that during the two months preceding her April 20, 2018 disclosure of Coyle's abuse to her aunt, she would often wake up to Coyle's hand touching her breasts underneath her shirt; and (2) Victim's testimony that, when she asked Coyle for help in determining her bra size, Coyle reached into Victim's bra and cupped her breasts.

Though the evidence established that Coyle touched Victim's breasts in both of these circumstances, his right to a unanimous jury verdict was nonetheless protected if the State elected "the particular criminal act on which it [would] rely to support the charge."  *Celis-Garcia*, 344 S.W.3d at 157; *cf. State v. Brammer*, 614 S.W.3d 18, 24 (Mo. App. E.D. 2020) (explaining that a verdict director infringes upon the defendant's right to a unanimous jury verdict if it allows for the possibility that the jurors, in

19

following the instructions, may individually choose different acts to support a conviction). Here, the State did that by requiring the jury to find that Coyle touched Victim's breasts during the time period between March 1, 2018, and April 20, 2018. The evidence established that during this period of time (the two months preceding Victim's disclosures to her aunt), Victim would often wake up to Coyle's hands on her breasts.[11] In contrast, the evidence did not establish when Coyle cupped Victim's breasts in an effort to measure her bra size. The jury could not have found, therefore, that Coyle was guilty on Count I based on the incident where Coyle cupped Victim's breast to measure Victim's bra size, as no evidence established that this incident occurred during the time frame set forth in the verdict director. We thus find unpersuasive Coyle's argument that the incident involving the measurement of Victim's bra size renders Instruction No. 5 erroneous because the incident "***could*** have occurred during the same period of time as the first allegation," [Appellant's Brief, p. 22] (emphasis added), as that would have required the jury to make a factual finding required by the verdict director based on rank speculation, and without any evidentiary support.[12]

We acknowledge that Victim testified that Coyle "often" put his hands on her breasts while she was asleep in the living room, and more specifically, that this conduct

---

[11]During closing argument, when discussing Count I and Instruction No. 5, the State referred exclusively to Victim's testimony about waking up with Coyle's hands on her breasts in the weeks prior to revealing Coyle's abuse to her aunt.
[12]"When the evidence is utterly silent about the existence or non-existence of some fact, and the finder of fact draws from such silence a conclusion about that fact, this is mere supposition or speculation. It is not an inference, and certainly not a reasonable inference." *State v. Shepherd*, 643 S.W.3d 346, 353 (Mo. banc 2022).

occurred at least once a month. This necessarily supports a conclusion that Coyle touched Victim's breasts while she slept in the living room on more than one occasion during the temporal period set forth in Instruction No. 5. However, Coyle does not argue that this renders Instruction No. 5 an erroneous multiple acts verdict director, and had he done so, the argument would not have been persuasive. Victim's testimony established "repeated, identical sexual acts committed at the same location during a particular time span," and Victim was "unable to testify to specific acts on specific dates." *State v. Walker*, 549 S.W.3d 7, 12 (Mo. App. W.D. 2018). This is to be distinguished from a record that establishes multiple acts occurring at different, specified locations, over an extended period of time, and thus a record that would permit a jury to differentiate between the repeated distinct acts. *See Celis-Garcia*, 344 S.W.3d at 157 n.8. In *State v. Hamby*, the Supreme Court recently confirmed that court of appeals decisions since *Celis-Garcia* have thus correctly concluded that "[t]he right to a unanimous verdict . . . is not implicated when the evidence does not sufficiently distinguish between repeated acts of abuse that would allow the jury to rely upon different acts in finding guilt." No. SC99554, 2023 WL3976252, at *7 (citations omitted). Thus, where evidence of multiple acts of abuse has been introduced at trial, and "the allegations involve[] repeated, ***indistinguishable acts*** of abuse over a relatively short period of time," and the "victim recounts vague and generalized aspects of the alleged abuse and does not sufficiently distinguish one repeated act from another, the jury is not faced with distinct acts from which to differentiate." *Id.* (emphasis added). Importantly, *Hamby* made clear that "indistinguishable acts" (referring to the defendant's culpable conduct) are not made

21

"multiple, distinct acts" by a victim's "general and vague descriptions about the varying circumstances and conditions surrounding the repeated acts of abuse," or by a victim's general description of the "nature of her condition and circumstance when the repeated abuse occurred." *Id.*

Instruction No. 5 did not infringe upon Coyle's right to a unanimous jury verdict, and the trial court did not plainly err in giving the instruction to the jury.[13]

Point One is denied.

**Point Two: Instruction No. 6**

Coyle's second point on appeal ("Point Two") challenges Instruction No. 6, which directed the jury to find Coyle guilty of Count II if it found beyond a reasonable doubt that, between approximately January 1, 2017, and April 20, 2018, Coyle touched Victim's bottom with his genitals "for the purpose of gratifying [Coyle's] sexual desire." Coyle asserts that the evidence established at least three distinct circumstances where Coyle touched Victim's bottom with his genitals, specifically: (1) Victim's testimony that, when Coyle assisted her in dyeing her hair approximately once or twice a year in the seventeen months before she disclosed Coyle's abuse to her aunt, Coyle would position himself behind her body and rub his genitals on her body; (2) Victim's testimony about an incident where Coyle pinned Victim down on a bed and rubbed his genitals against her

---

[13]As with many challenges to jury instructions brought pursuant to *Celis-Garcia*, Instruction No. 5 would have differentiated more clearly between multiple, distinct acts by including, in addition to a temporal reference, other evidentiary details differentiating the acts. For instance, paragraph first of Instruction No. 5 could have included the language "the defendant touched the breasts of [Victim] ***while she slept in the living room of the defendant's home in Brookfield.***"

22

body after she fell while running away from Coyle; and (3) Victim's testimony about instances where Coyle would call her into his bedroom, insist that she lie down next to him, and then rub his genitals against her bottom after talking to Victim for a while.

Though the evidence established that Coyle touched Victim's bottom with his genitals in all of the circumstances Coyle describes, his right to a unanimous jury verdict was nonetheless protected for the reasons discussed in connection with Instruction No. 5. While Victim testified that Coyle assisted her in dyeing her hair once or twice a year during the seventeen months preceding her disclosure of Coyle's abuse, Victim did not testify about when the other two circumstances occurred. There was no evidence from which the jury could have concluded or reasonably inferred that the second or third circumstances identified by Coyle occurred during the time frame identified in Instruction No. 6.[14] *See State v. Shepherd*, 643 S.W.3d 346, 353 (Mo. banc 2022). And, even though Victim's testimony necessarily suggests that the hair dyeing incident occurred more than once during the temporal period identified in Instruction No. 6, the multiple occasions where Coyle rubbed his genitals against Victim's bottom while he assisted her in dyeing her hair were not differentiated in the evidence, making it unnecessary to do so in the verdict director.

---

[14]The State improvidently referred to all three circumstances of genital-to-bottom touching identified by Coyle when it discussed Count II during closing argument, but that does not require us to conclude that Instruction No. 6 was plainly erroneous, in light of its temporal limitation, and the absence of any evidence in the record to support finding that two of the three circumstances identified by Coyle occurred within that temporal period. We presume that the jury followed the instructions, including the verdict directors, and disregarded the State's closing argument. *State v. Brown*, 614 S.W.3d 5, 12 (Mo. App. E.D. 2020).

23

Instruction No. 6 did not infringe upon Coyle's right to a unanimous jury verdict, and the trial court did not plainly err in giving the instruction to the jury.[15]

Point Two is denied.

**Point Three: Instruction No. 7**

Coyle's third point on appeal ("Point Three") challenges Instruction No. 7, which directed the jury to find Coyle guilty of Count III if it found beyond a reasonable doubt that, between approximately July 13, 2015, and December 31, 2016, Coyle touched Victim with his genitals "for the purpose of gratifying [Coyle's] sexual desire" and that Coyle did so by use of forcible compulsion. Coyle asserts that the evidence established three distinct circumstances where Coyle touched Victim with his genitals, specifically: (1) Victim's testimony about dyeing her hair; (2) Victim's testimony that Coyle pinned Victim on the bed after she tripped during a tickling incident; and (3) Victim's testimony that Coyle would often call Victim into his room and insist that she lay on his bed. Coyle further asserts that the first two of these circumstances involved the use of forcible compulsion, and that the third circumstance arguably could have involved the use of forcible compulsion.

The jury could not have relied on evidence about Victim's hair dyeing incidents to convict Coyle on Count III. The evidence established that the hair dyeing incidents occurred in the seventeen-month period immediately preceding disclosure of Coyle's

---

[15]Like Instruction No. 5, the specificity of Instruction No. 6 could have been improved. For instance, in addition to reference to a temporal period, paragraph first of Instruction No. 6 could have stated, "the defendant touched [Victim's] bottom with defendant's genitals *while Victim was dyeing her hair*."

24

abuse to Victim's aunt. This time period post-dates the time period set forth in Instruction No. 7. Because no evidence in the record would have permitted the jury to conclude or reasonably infer that the hair dyeing incidents occurred between July 13, 2015, and December 31, 2016, the hair dyeing incidents are immaterial to our review of Instruction No. 7. *See Shepherd*, 643 S.W.3d at 353.

The evidence about incidents where Coyle asked Victim to lie on his bed, then spoke with her awhile before beginning to touch her with his genitals, are insufficient to support a finding of forcible compulsion, defined in Instruction No. 8 as "either physical force that overcomes reasonable resistance or a threat, express or implied, that places a person in reasonable fear of death, serious physical injury, or kidnapping of such person or another person."[16] There was no evidence of physical force or reasonable resistance; nor any evidence of threats, express or implied, associated with these incidents. There is no doubt the incidents left Victim feeling uncomfortable, but no evidence permits an inference that Coyle's abhorrent conduct placed Victim in reasonable fear of death, serious physical injury, or kidnapping. *See State v. Daleske*, 866 S.W.2d 476 (Mo. App. 1993) (reversing a stepfather's conviction of deviate sexual intercourse with his stepdaughter based on forcible compulsion because no evidence supported finding threats of death or serious bodily injury or kidnapping, and because inherent compulsion arising from dependency and age of a child is not sufficient to satisfy the definition of forcible

---

[16]The definition of "forcible compulsion" set forth in Instruction No. 8 is identical to the statutory definition of the term, found in section 566.061(12), RSMo Supp. 2015.

compulsion). In fact, in describing the incidents at trial, Victim testified that although the incidents made her uncomfortable, she did not feel unsafe.

That leaves only the circumstance where Coyle forcibly pinned Victim's arms and laid on top of her after she ran from Coyle, then tripped and fell onto the bed. The evidence describing this incident is consistent with the definition of forcible compulsion. Since this incident happened on only one occasion, Instruction No. 7 did not improperly submit multiple acts without sufficient specificity.[17]

Instruction No. 7 did not infringe upon Coyle's right to a unanimous jury verdict, and the trial court did not plainly err in giving the instruction to the jury.[18]

---

[17]Consistent with this conclusion, the State's closing argument addressing Count III was limited to a single event: "You heard her testify, as to Count III, when he pinned her down on the bed and she couldn't move her arms and he was rubbing against her." In Coyle's closing argument, counsel stated, "And the third count, again, is where he supposedly held her down and rubbed his genitals on her. I asked him if he had done that, and he said he did not."

[18]We are cognizant that no evidence in the record established when the incident involving Victim being pinned to the bed occurred, and thus no evidence in the record established, or permitted an inference that, the incident occurred between July 13, 2015, and December 31, 2016 as posited in paragraph first of Instruction No. 7. However, Coyle does not assert a sufficiency-of-the-evidence challenge on appeal. While Rule 29.11(e) provides that a challenge to the sufficiency of the evidence to support a conviction does not have to be raised in the trial court to allow for its consideration on appeal, the wholesale failure to raise a sufficiency challenge on appeal preserves nothing for appellate review. *See State v. Hansen*, 660 S.W.3d 45, 49 n.2 (Mo. App. S.D. 2023).

In any event, "[b]ecause time is not an essential element of [sex offenses], 'the state is not confined in its evidence to the precise date stated in the information, but may prove the offense to have been committed on any day before the date of the information and within the period of limitation.'" *State v. Carney*, 195 S.W.3d 567, 571 (Mo. App. S.D. 2006) (quoting *State v. Mills*, 872 S.W.2d 875, 878 (Mo. App. S.D. 1994)). The inclusion of a general time frame "in the instruction does not place a burden upon the State to prove the precise time period alleged" beyond a reasonable doubt. *State v. Kelso,* 391 S.W.3d 515, 524 (Mo. App. W.D. 2013) (citing *Carney*, 195 S.W.3d at 571-72). Here, there was only one incident described in the evidence that involved both the

Point Three is denied.

**The Trial Court Did Not Abuse its Discretion in Admitting Propensity Evidence (Points Four and Five)**

Coyle's final points relied on challenge the trial court's admission of propensity evidence. In his fourth point relied on ("Point Four"), Coyle asserts that the trial court abused its discretion in admitting D.P.'s testimony describing an instance when she was around fourteen years of age at E.G.'s grandmother's house, where Coyle pinned her down, rubbed his genitals against her, and touched her breasts when he thought she was asleep. Coyle's fifth point relied on ("Point Five") asserts that the trial court abused its discretion in admitting E.G.'s testimony that, when she was around fourteen years of age, Coyle, her uncle, touched her breasts and bottom at her grandmother's house while D.P. was visiting, and on another occasion pulled his penis out of his pants while she was using the computer in her aunt's house. In both points, Coyle asserts that the testimony,

touching of Victim with Coyle's genitals and forcible compulsion, suggesting that a sufficiency of the evidence challenge about the time period during which the incident occurred would not have been successful, even had it been raised on appeal.

The line of cases holding that time is not an essential element of sex offense crimes is distinguishable from those cases that hold that the use of a temporal period in a verdict director may remediate what would otherwise be an erroneous submission of multiple, distinct acts in a single verdict director. The use of a temporal period to differentiate multiple, distinct acts serves the purpose of ensuring a unanimous jury verdict, not because the time period is an essential element of the submitted crime, but because the time period provides a factual basis for distinguishing the submitted act from other similar acts discussed in the evidence.

However, potential tension between the use of a temporal period in a verdict director to distinguish multiple, distinct acts as to ensure juror unanimity, and cases which hold that the inclusion of a time frame in a verdict director does not increase the State's burden to prove a crime occurred beyond a reasonable doubt, underscore the advisability of using other evidentiary bases to distinguish multiple, distinct acts in verdict directors where possible.

27

which was offered to show Coyle's propensity to commit the charged crimes involving Victim, was substantially more prejudicial than probative because the evidence was not presented in a dispassionate way, the jury was told that Coyle was never charged for conduct involving D.P. and E.G., and the effect of the evidence was to overshadow the evidence of the charged crimes.

Article I, sections 17 and 18(a) of the Missouri Constitution combine to guarantee that a defendant has "the right to be tried only on the offense charged." *State v. Burns*, 978 S.W.2d 759, 760 (Mo. banc 1998). This right has been interpreted to prohibit the admission of evidence of prior crimes for the purpose of demonstrating the defendant's propensity to commit the charges with which defendant is actually charged. *Id.* "[P]ropensity evidence is evidence of . . . crimes, wrongs, or acts used to establish that [a] defendant has a natural tendency to commit the crime charged." *State v. Jackson*, 636 S.W.3d 908, 920 (Mo. App. W.D. 2021) (quoting *State v. Garretson*, 598 S.W.3d 643, 653 (Mo. App. W.D. 2020)).

However, when a defendant is charged with sexual offenses committed against children, article 1, section 18(c) of the Missouri Constitution creates a narrow exception to the constitutional protection to be tried only on the offense charged by permitting relevant evidence of prior criminal acts to be admitted:

> Notwithstanding the provisions of sections 17 and 18(a) of this article to the contrary, in prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts, whether charged or uncharged, is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged. The court may exclude relevant evidence of prior

28

criminal acts if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.

The trial court admitted D.P.'s and E.G.'s testimony as propensity evidence pursuant to this provision of the Missouri Constitution.

Coyle does not contest that the testimony of D.P. and E.G. was logically relevant because it had "a legitimate tendency to directly prove [Coyle's] guilt of the offense[s] for which he is on trial." *State v. Thigpen*, 548 S.W.3d 302, 314 (Mo. App. E.D. 2017). Indeed, the testimony from D.P. and E.G. establishes the similarities in ages of D.P., E.G., and Victim at the time of the offenses against them, and Coyle's willingness to engage in sexual misconduct with victims he knows or is related to. *See State v. Shepard*, 662 S.W.3d 761, 770 (Mo. App. E.D. 2023) (holding that uncharged sexual misconduct was probative of defendant's propensity to commit charged offenses given similarities in the ages of the victims of the uncharged and charged crimes, and the defendant's familiarity with the victims). The testimony from D.P. and E.G. also establishes the similarities in Coyle's alleged sexual conduct. *See id.* Moreover, "[t]he need for, and corresponding probative value of, propensity evidence is greater when the State's case depends only on the victim's testimony and that victim's credibility is attacked by the defense," as was the case here. *Id.*

Though Coyle does not challenge the logical relevance of D.G. and E.G.'s testimony, Coyle relies on the last sentence of article I, section 18(c) of the Missouri Constitution to argue that the propensity evidence should nonetheless have been excluded because its probative value was substantially outweighed by the danger of unfair

29

prejudice. *State v. Prince*, 534 S.W.3d 813, 821 (Mo. banc 2017) (holding that the probative value of the evidence must not simply be outweighed by, but "*substantially outweighed by the danger of unfair prejudice*"). This determination is left to the sound discretion of the trial court. *Id.* at 818, 821.

"Several factors may bear on a court's analysis of the prejudicial effect of propensity evidence: whether the jury could infer the defendant was punished for his past criminal acts, how the State goes about proving the prior act at trial, whether the charged crime is overshadowed by evidence of the prior act, and the manner in which the State uses the prior act at trial." *Shepard*, 602 S.W.3d at 770-71 (citing *Williams*, 548 S.W.3d at 290-91). With respect to the first factor, "[i]f the jury is allowed to infer (or, worse, speculate) the defendant escaped punishment in the past, it may be inclined to convict merely to punish the defendant for past criminal acts rather than for the crime charged." *Williams*, 548 S.W.3d at 290. With respect to the second factor, the danger of unfair prejudice is increased with live testimony from former victims, in lieu of proving prior criminal acts "by way of a short, dispassionate stipulation." *Id.* With respect to the third factor, unfair prejudice is less likely to be found where the prior criminal acts are "far less alarming than the evidence of the charged crimes." *Id.* With respect to the fourth factor, "[i]f the prosecution spends an undue amount of time emphasizing the prior criminal act or flagrantly invites the jury to convict the defendant because he is a 'bad' or 'wicked' man rather than because he committed the crime charged, the danger of unfair prejudice from that evidence quickly becomes untenable." *Id.* at 291. "On the other hand, if the prosecution spends relatively little time on the issue of defendant's prior crimes and

30

merely uses the evidence for its proper purpose (namely, to suggest the defendant has a propensity to commit the charged crime), the dangers decrease and may--on balance--not be unfair. *Id.* These factors are not exhaustive, and the application of these factors is "intensely case-specific." *Id.* at 288.

**Whether the Jury Could Infer that Coyle Was Punished for the Acts Involving D.P and E.G.**

D.P. testified on direct examination that she reported Coyle's sexual misconduct to her mother close in time to its occurrence, and was then interviewed at the Children's Advocacy Center in Trenton. During cross-examination, Coyle's counsel asked D.P. to confirm that Coyle had never been criminally charged in response to her allegations, in an attempt to discredit the allegations. E.G. testified that her mom was contacted by D.P.'s mom after D.P. disclosed Coyle's conduct, which led E.G. to report the incidents in which she had been involved with Coyle during a Children's Advocacy Center interview. Once again, it was Coyle's counsel who, during cross-examination, asked E.G. to confirm that no criminal charges were ever filed against Coyle based on E.G.'s disclosures. Unfair prejudice, if any, that existed because the jury might have been inclined to punish Coyle for his past criminal acts rather the crimes for which he was charged, was invited by Coyle. We do not question counsel's strategic choice to challenge the credibility of D.P. and E.G.'s reports of abuse by making sure the jury knew that no criminal charges were ever filed against Coyle based on those reports. But, having elected that strategy, Coyle cannot now complain that the jury's awareness of his uncharged status supports the conclusion that admission of the propensity evidence was erroneous because the

31

probative value of the evidence was substantially outweighed by the prejudicial effect of the evidence.

**How the State Proved the Prior Acts at Trial**

The prior acts committed by Coyle against D.P. and E.G. were proven by live testimony. Live testimony represents an increased danger of unfair prejudice. *Williams*, 548 S.W.3d at 290. However, "[l]ive testimony regarding prior bad acts is not *per se* unfairly prejudicial." *Shepard*, 662 S.W.3d at 771. The risk of unfair prejudice from live testimony about prior sexual misconduct increases if the testimony is "graphic . . . , overly detailed, and not dispassionate." *Id.* (quoting *State v. Brown*, 596 S.W.3d 193, 210 (Mo. App. W.D. 2020)).

Here, D.P.'s testimony was live, but her direct-examination encompassed only seven pages of the transcript. And though D.P.'s demeanor cannot be discerned from the written transcript, there is no indication that she became emotional during her testimony. Moreover, the State's questions of D.P. elicited brief, factual responses, that were limited to reporting Coyle's conduct, with virtually no discussion of D.P.'s feelings beyond simply stating that the conduct made her "uncomfortable." Similarly, E.G.'s testimony was live, but her direct examination encompassed just over seven pages of the transcript. As with D.P., the State's questions of D.P. elicited brief, factual responses about Coyle's conduct, with virtually no discussion of E.G.'s feelings about the conduct, and with no indication in the record to suggest that E.G.'s testimony was emotional.

In addition, the prior conduct about which D.P. and E.G. testified occurred in late 2005, when both witnesses were around fourteen years of age. By the time of their live

32

testimony, D.P. was twenty-nine, and E.G. was thirty. Their testimony as adults was limited to only those details necessary to describe Coyle's conduct, and was devoid of the emotions and empathy that would have been triggered had their contemporaneous videotaped interviews at the Children's Advocacy Center been admitted into evidence. *See Shepard*, 662 S.W.3d at 771 (noting evidence of prior uncharged sexual misconduct was not unfairly prejudicial when offered through the live testimony of a victim who was an adult by the time of trial where the testimony was limited to a clinical discussion of the details necessary to explain the conduct). In fact, the trial court refused the State's request to admit the contemporaneous interviews at the Children's Advocacy Center, and in the process, imposed reasonable controls on the admission of propensity evidence that were designed to minimize the prejudicial impact of the evidence.

We are not persuaded that the live testimony from D.P. and E.G. rendered admission of evidence of Coyle's prior uncharged acts unfairly prejudicial.

### Whether the Charged Crimes were Overshadowed by Evidence of the Prior Acts

Unfair prejudice is less likely to be found where the prior criminal acts are "far less alarming than the evidence of the charged crimes." *Williams*, 548 S.W.3d at 290-91. The isolated uncharged acts attributed to Coyle by D.P. and E.G., though similar in terms of Coyle's conduct, were far less jarring than the long-term, pervasive acts of abuse about which Victim testified, particularly as Victim is Coyle's daughter. Moreover, though Coyle's point relied on asserts that the evidence about Coyle's prior acts overshadowed the charged crimes, Coyle did not develop this assertion in the argument portion of his

33

brief.  *See Farr v. State*, 665 S.W.3d 394, 400 (Mo. App. S.D. 2023) ("Mere conclusions and the failure to develop an argument with support from legal authority preserve nothing for review.").  This factor does not support a conclusion that Coyle was unfairly prejudiced by the admission of the propensity evidence.

**The Manner in Which the State Used the Prior Acts at Trial**

During closing argument, the State commended D.P. and E.G. for being at trial to testify about what had happened to them, and then argued: "And they went and they told the truth and they did their job as kids, a job they should never have had to do.  And they expect us as adults to do our job.  That's what [Victim] is asking, for you to do your job.  That's all we can ask."  Coyle argues that the effect of this argument was to encourage the jury to convict Coyle of his current charges because he had not been punished for the prior conduct.

Though we agree that the State's argument could be interpreted as a veiled comment on the fact that D.P. and E.G.'s reports of abuse did not lead to Coyle being punished, we do not agree that the State's references to D.P. and E.G. unduly emphasized Coyle's prior acts, or the fact that he evaded prosecution for those acts.  Nor did the State invite the jury to convict Coyle "because he is a 'bad' or 'wicked' man rather than because he committed the crime[s] charged."  *Williams*, 548 S.W.3d at 291.  Instead, read in context, the State's comments asking the jury to do their job accompanied the State's criticism of Coyle's attacks on Victim's credibility, which included pointing out that Coyle denied every aspect of Victim's testimony, including innocuous details and activities like playing with his daughter or going into her room at night to check on her.

34

The State's reliance on the propensity evidence was limited to its proper purpose, namely, to suggest that Coyle had a propensity to commit the charged crimes, and thus minimized the risk that the jury would convict Coyle for his charged crimes as a means of punishing him for his prior uncharged acts. *Brown*, 596 S.W.3d at 211.

Though the factors bearing on a trial court's analysis of the prejudicial effect of propensity evidence support a conclusion that the trial court did not abuse its discretion in admitting the propensity evidence, Coyle nonetheless relies on a concurring opinion in *State v. Minor*, 648 S.W.3d 721 (Mo. banc 2022) (J. Powell, concurring), to argue that the probative value of unadjudicated allegations of prior sexual misconduct through live victim testimony is nearly always substantially outweighed by the prejudicial impact of such evidence. Judge Powell's concurring opinion is *dicta*, as the admission of propensity evidence on the basis that its prejudicial value substantially outweighed its probative value was not preserved for appellate review. *Id.* at 742. However, the concurring opinion was joined by a majority of the Court, suggesting that the precedential value of the concurring opinion cannot be overlooked. *Id.* at 738

By their nature, uncharged or unadjudicated crimes are generally not susceptible of proof except through live testimony. *Id.* at 739. Judge Powell observed that there are two risks of admitting evidence of unadjudicated prior sexual acts through live testimony that do not exist with respect to evidence of an adjudicated prior criminal act: (1) "[I]nstead of the stoic and emotionless presentation of an exhibit evincing the existence of a prior conviction, we have a living, breathing person recounting unfathomable details of traumatic events and abuse"; and (2) "[O]n top of the increased emotional effect of

35

such evidence lies the fundamental problem of establishing the defendant engaged in the unadjudicated criminal act." *Id.* at 739. Powell asserted that the trial court "rarely should admit allegations of unadjudicated prior criminal offenses" because the "emotional" testimony from witnesses and "inevitable mountain of evidence necessary to demonstrate and challenge whether the prior, uncharged allegations actually occurred . . . will always pose a danger of unfair prejudice that is likely to far exceed its probative value." *Id.* at 741.

Coyle asserts that both dangers existed here, demanding a conclusion that the probative value of D.P.'s and E.G.'s testimony was substantially outweighed by its prejudicial effect. In doing so, however, Coyle ignores later observations by Judge Powell regarding evidence of unadjudicated prior criminal acts:

> If courts choose to admit such evidence, the emotional characteristics of this evidence must somehow be contained. In addition, the extrinsic and collateral evidence surrounding the alleged victim's testimony must, in some manner, be fairly limited, so the resulting confusion and unfair prejudice does not spin out of control and grow exponentially greater than the probative value.

*Id.* Here, though the trial court did not have the benefit of the concurring opinion in *Minor*, which was issued after Coyle's case was tried, the trial court nonetheless did exactly as Judge Powell suggested. The trial court limited the emotional characteristics of the propensity evidence so that the jury would only hear live testimony from D.P. and E.G., both adults at the time of trial, about what happened approximately fifteen years earlier when they were children. The emotionally charged videotaped interviews of both D.P. and E.G. by the Children's Advocacy Center were excluded. Moreover, the inquiry

36

of D.P. and E.G. was limited to questions that were designed to elicit no more than the basic facts to describe Coyle's prior uncharged conduct. And, though D.P. or E.G. both testified that their reports of abuse did not lead to charges being filed against Coyle, it was Coyle's counsel, not the State, who elicited this testimony from D.P. and E.G. in a strategic attempt to discredit their reports.

While Coyle denied the veracity of D.P.'s and E.G.'s testimony, we cannot say that Coyle's trial "spun out of control" given the admission of live testimony involving unadjudicated criminal acts. Absent a categorical holding by our Supreme Court that unadjudicated criminal acts can never be admitted through live witness testimony as propensity evidence pursuant to article I, section 18(c) of the Missouri Constitution, we cannot find that the trial court's admission of the propensity evidence in this case was plainly erroneous because its probative value was substantially outweighed by its prejudicial impact.

Points Four and Point Five are denied.

### Conclusion

The Judgment is affirmed.

_____
Cynthia L. Martin, Judge

All concur

37